MPR:EMR
F.# 2018R02300

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER 347-300-5824 THAT IS STORED AT PREMISES CONTROLLED BY SPRINT, INC. | SEARCH WARRANT APPLICATION FOR HISTORICAL CELL-SITE INFORMATION<br><br>Case No. 19-MC-1641 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, DANIEL FEAVER, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with the cellular telephone assigned call number 347-300-5824 (the "Target Telephone"), that is stored at premises controlled by Sprint, Inc. ("Sprint"), a wireless telephone service provider headquartered in Topeka, Kansas. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Sprint to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately four years. I am presently assigned to the New York Metro Safe Streets

Task Force, where I investigate gang activity and narcotics trafficking. During my tenure with the FBI, I have participated in numerous investigations of gang activity and narcotics trafficking, during which I have (a) conducted physical surveillance, (b) executed search warrants, (c) debriefed cooperating witnesses and victims, (d) reviewed and analyzed numerous taped conversations of those engaged in organized crime and gang activities, and (e) monitored wiretapped conversations and reviewed line sheets prepared by wiretap monitors. I have participated in investigations in which law enforcement officers have reviewed social media accounts of suspected gang members and narcotics traffickers and which involved the execution of search warrants involving electronic and social media, including social media accounts such as Facebook, Instagram, and Twitter.

3. The facts in this affidavit come from my personal observations, my training and experience, information obtained from other agents and witnesses and my review of reports. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(g) have been committed by DARRELL WOODFORD. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachment B.

## PROBABLE CAUSE

5. I have been investigating DARRELL WOODFORD ("the defendant") for being a felon in possession of ammunition as a result of a shooting that he committed on

August 30, 2018, in the Eastern District of New York. The defendant is prohibited from possessing a firearm or ammunition as a result of his September 8, 2016 conviction in New York County for Robbery in the Second Degree, a class C violent felony in violation of New York Penal Law § 160.10(2).

### A. Overview

6. On August 30, 2018, the defendant chased a male victim (the "Victim") to the courtyard of the Flatbush Gardens housing development, located at 3104 Newkirk Avenue in Brooklyn, New York. There, the defendant pulled out a gun and shot the Victim multiple times at close range, striking him once in the left thigh and twice in the lower torso. The defendant then fled with the gun, leaving the Victim on the ground bleeding.

7. Within minutes of the shooting, police officers arrived and secured the scene. An ambulance arrived and took the Victim to a nearby hospital, where doctors treated him for his wounds.[1] Approximately one hour after the shooting, an officer from the New York City Police Department ("NYPD")'s Evidence Collection Team collected three Remington-Peters .380 auto-caliber cartridge casings from the area where the defendant shot the Victim.[2]

### B. The Video Surveillance

8. Video surveillance captured the shooting and many of the events before and after the shooting. First, on the evening of August 29, 2018, the night before the shooting,

---

[1] For medical reasons, the hospital staff decided to keep the bullets in the Victim's body rather than remove them.

[2] On September 1, 2018, law enforcement officers showed the Victim a photo array containing the defendant's photograph. The Victim was not able to make an identification.

video surveillance captured the defendant inside a deli at 1990 Bedford Avenue (the "1990 Bedford Avenue Video"), in Brooklyn, New York, along with approximately five other black males. The defendant was wearing a white short-sleeve tee-shirt, black and white basketball shorts bearing a black Nike logo, a white scarf on his head, and red and white Nike sneakers. The 1990 Bedford Avenue Video captured a clear view of the defendant's face, including a view of the defendant's closely cropped beard.

9. While the defendant was inside the deli, he and several male cohorts surrounded a victim and demanded that the victim empty his pockets. The victim pulled out his phone, and one of the men in the defendant's group took the phone and punched the victim in the face. Another male in the group made the victim unlock his phone and punched the victim in the face again. Shortly thereafter, the defendant and the group of males then left the deli.

10. The 1990 Bedford Avenue Video also captured a clear view of the other males with the defendant inside the deli on August 29, 2018. Notably, the video showed (1) a heavy-set black male wearing a black or navy short-sleeve shirt with a white box over the left breast pocket, black shorts with a white trim at the bottom, grey and white sneakers, a black scarf on his head and with a white cast on his right arm; and (2) a tall black male with an afro, wearing a black short-sleeve tee-shirt with a white Puma logo over the left breast, black shorts with a white design on the left pant leg, and red underwear that were clearly visible under the black shorts, which were pulled down low.

11. The next day, on August 30, 2018, at approximately 8:51 p.m., video surveillance captured the defendant and four other young males walking in front of a deli at

1844 Nostrand Avenue (the "1844 Nostrand Avenue Video"), in Brooklyn, New York. The defendant was wearing the same outfit as the previous night: a white tee-shirt, black and white basketball shorts, and red and white Nike sneakers. Unlike the night before, however, the defendant was not wearing any covering on his head. Although the 1844 Nostrand Avenue Video did not capture a close up view of the defendant's face, the video clearly captured the defendant's closely cropped beard and closely cropped haircut.

12. The 1844 Nostrand Avenue Video captured the defendant and the other males walking in a line along Nostrand Avenue. That video showed two men with defendant who matched the descriptions of two of the men captured with him on the 1990 Bedford Avenue Video during the previous night. Specifically, (1) leading the group was a heavy-set black male wearing a black or navy short-sleeve shirt with a white box over the left breast pocket, black shorts with a white trim at the bottom, grey and white sneakers, a black scarf on his head and a white cast on his right arm and (2) the second person in the line was a tall black male with an afro, wearing a black short-sleeve tee-shirt with a white Puma logo over the left breast, black shorts with a white design on the left pant leg, and red underwear that are clearly visible under the black shorts, which are pulled down low. The third person in the line was the defendant. Following the defendant was a fourth black male who was shirtless. Following several steps behind the group was a fifth black male, wearing a black tee-shirt.

13. On the 1844 Nostrand Avenue video, the heavy-set male with the cast walked towards three males who were walking in the opposite direction, and punched the first male in the face. The male whom he punched fell to the ground briefly, and then got up and took off running. The two males with him also took off running. One of those two males was the

Victim of the August 30 shooting; he was wearing a white tee-shirt, black pants with a white stripe, white sneakers, and a red scarf on his head. The Victim ran in the direction of 3104 Newkirk Avenue, followed by the defendant and the four other males with him.

14. At 8:51:58 p.m., video surveillance captured the defendant running in front of 3102 Newkirk Avenue (the "3102 Newkirk Avenue Video"). Running next to the defendant were the male with the afro and the shirtless male, and following them was the heavy-set male with the cast. As he ran by, the defendant's white shirt and black and white shorts with a Nike logo were clearly visible in the video.

15. At 8:52:10 p.m., video surveillance from 1356 New York Avenue (the "1356 New York Avenue Video") captured the defendant chasing the Victim along a walkway that leads into the courtyard of 3104 Newkirk Avenue. The defendant's white shirt, black and white shorts and his red and white sneakers were clearly visible in the video. As the defendant chased the Victim into the courtyard, he extended his right hand with a gun and shot at the Victim. The video captured the muzzle flash of the gun. The defendant lowered his right hand and kept running, then raised it and shot again as he ran off the screen.

16. At 8:52:11 p.m., video surveillance from 3104 Newkirk Avenue (the "3104 Newkirk Avenue Video") captured the defendant chasing the Victim along the walkway and into the courtyard of 3104 Newkirk Avenue. As they entered the courtyard, the defendant outstretched his right hand, as if he was shooting the gun. At approximately 8:52:13 p.m., the Victim fell to the ground. The Victim got up, but the defendant ran closer to him and extended his right hand out as if shooting again. The Victim fell back to the ground, and the defendant walked even closer. As the Victim lay on the ground, the defendant appeared to

shoot him once from close range, back up and shoot two more times, then get closer again and shoot at least once more. The video again captured the muzzle flash of the gun. The defendant then ran off in the direction of New York Avenue, leaving the Victim on the ground.

17. Immediately after the shooting, the 3102 Newkirk Avenue Video captured the shirtless male and another male take off running towards Avenue D. Closely behind them, the defendant ran from the shooting towards Avenue D. The defendant's white shirt and black and white shorts and the whites of his sneakers were clearly visible in the video.

18. Shortly thereafter, two videos from Avenue D and Nostrand Avenue (the "Avenue D Videos") captured the defendant, the shirtless male and the male with a black tee-shirt running down Avenue D. The defendant's white tee-shirt, black and white basketball shorts with a Nike logo, red and white Nike sneakers, and closely cropped hair and beard are clearly visible in the videos. As the defendant ran by on one of the videos, the camera captured him turning back to hand an object to the male in the black shirt, whom law enforcement agents later identified as Tyrese Battle. As he did so, the defendant's face was clearly visible on the video.

### C. The Identifications

19. The Field Intelligence Officer ("FIO") and Assistant Field Intelligence Officer ("AFIO") of the NYPD's 70th precinct identified the defendant as the shooter in the videos. The FIO and AFIO's responsibilities included patrolling the 70th precinct to prevent and deter shootings, robberies, assaults and other gang violence that occurred in the precinct, and

familiarizing themselves with individuals who associated themselves with gangs within the precinct.

20. Over the course of the summer of 2018, the FIO and AFIO became familiar with the defendant, who frequently spent time in the 70th precinct with members of a gang known as the Eight Trey Cowboy Crips.[3] For example, on July 17, 2018, at approximately 9:40 p.m., the FIO, the AFIO, and a third police officer were on patrol within the 70th Precinct when they performed a traffic stop of a car in which the defendant was a passenger. They pulled the car over in front of 2214 Church Avenue in Brooklyn, New York, a well-lit area near several large stores.

21. During the car stop, the officers asked the defendant to get out of the car, and the FIO and AFIO spoke face-to-face with the defendant for several minutes as he stood against the car's bumper. The AFIO asked the defendant for his name, and the defendant responded that his name was Darrell Smith. After a few minutes, the defendant admitted that his name was Darrell Woodford. The AFIO ran the defendant's name in the NYPD system to make sure that he did not have any active warrants before letting him go.

22. In addition to personally observing the defendant in the 70th precinct, over the summer of 2018, the FIO and AFIO also regularly reviewed photographs and comments that the defendant posted on his publicly available social media accounts. The officers also

---

[3] The Eight Trey Cowboy Crips are a subset of a national gang known as the Crips. The Eight Trey Cowboy Crips operate primarily within the Flatbush, East Flatbush, and Prospect Park neighborhoods within the 67th and 70th Precincts of the NYPD. Law enforcement officers believe they are comprised of approximately 20-30 active members.

reviewed a four minute long music video featuring the defendant posted on YouTube in July 2018 multiple times.

23. Following the shooting on August 30, 2018, the FIO and the AFIO viewed the 1844 Nostrand Avenue Video, the 1356 New York Avenue, and the 3104 Newkirk Avenue Video. The FIO and the AFIO were not together, but were on the telephone with each other as they viewed the videos. Both the FIO and the AFIO identified the shooter, who was wearing the white tee-shirt, black and white basketball shorts, and red and white Nike sneakers, as the defendant.

24. Before the FIO and the AFIO viewed the videos on August 30, officers from the 67th precinct provided them with the name of a suspect whom they believed to be the heavy-set male with the cast from the 1844 Nostrand Avenue Video. The FIO and the AFIO disagreed that the person in the video matched the name provided, and they identified the person as someone other than the individual mentioned by the officers from the 67th Precinct. No other names of potential suspects were provided to FIO and the AFIO before they viewed the videos and made their identifications.

25. On September 14, 2018, the FIO and the AFIO viewed the Avenue D Videos. The officers were together when they viewed the videos. Both the FIO and the AFIO identified the individual who was wearing the white tee-shirt, black and white basketball shorts, and red and white Nike sneakers as the defendant.

26. On September 14, 2018, the FIO and the FIO arrested the defendant at 2875 Flatbush Avenue in Brooklyn, New York, on charges of violating his state parole by committing the August 30, 2018 shooting.

27.     Following the defendant's arrest, the FIO and the AFIO reviewed the 1990 Bedford Avenue Video. They both identified the male wearing the white short-sleeve tee-shirt, black and white basketball shorts bearing a black Nike logo, a white scarf on his head, and red and white Nike sneakers as the defendant.

28.     On November 21, 2018, the Honorable Peggy Kuo, United States Magistrate Judge for the Eastern District of New York, issued an arrest warrant for the defendant based on an affidavit and complaint. On November 23, 2018, Federal Bureau of Investigation agents arrested the defendant pursuant to the warrant. On December 6, 2018, a grand jury in the Eastern District of New York returned an Indictment charging the defendant with being a felon in possession of ammunition.

### D. The Phone Records

29.     At the time of the August 30, 2018, assault, the defendant was on New York State parole as a result of his September 8, 2016 conviction for Robbery in the Second Degree. Under the conditions of his parole, the defendant was required to provide his current cell phone number to his parole officer. The defendant told his parole officer that the Target Telephone was his cell phone number.

30.     On March 12, 2019, the Honorable Ramon E. Reyes signed a search warrant for the defendant's Facebook records. I have reviewed those records and observed that on September 4, 2019, while he was exchanging messages with another individual over Facebook, the defendant provided the Target Telephone as his cell phone number.

31.     Call detail records for the Target Telephone provided by Sprint pursuant to a subpoena indicate that the Target Telephone was in use on August 30, 2018. In addition, the

call detail records are consistent with the defendant's presence at the scene of the shooting. As described above, the shooting occurred at approximately 8:52 p.m. on August 30, 2018 and the call detail records indicate that the defendant did not make or receive any calls or messages between 8:40 p.m. and 8:58 p.m., or during the time leading up to, during and immediately after the shooting.

32. In addition, the call detail records corroborate the FIO and the AFIO's identifications of the defendant and others with him on the surveillance videos. As described above, moments after the shooting on August 30, 2018, the defendant was captured on the Avenue D Videos handing an object to a male whom law enforcement officers identified as Tyrese Battle. The call detail records indicate that, beginning at 8:58 p.m. and continuing until 9:27 p.m. on August 30, the defendant exchanged seven different phone calls with a telephone number that law enforcement officers know to be associated with Tyrese Battle.

33. Based on the foregoing evidence, there is probable cause to believe that information on the Target Telephone will tend to produce evidence probative of the crime under investigation. For example, historical cell-site records for August 29, 2018 through September 14, 2018 will show the defendant's whereabouts on those dates, including whether he was at the location of the shooting on August 30, 2018, whether he was at the location of the robbery on August 29, 2018, and his actions following the shooting and up to his arrest. The requested cell-site information will also show the defendant's typical daily patterns, which are relevant comparison points to the date of the charged robbery.

34. In my training and experience, I have learned that Sprint is a company that provides cellular telephone access to the general public. I also know that providers of

cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

35. Based on my training and experience, I know that Sprint can collect E-911 Phase II data about the location of the Target Telephone, including by initiating a signal to determine the location of the Target Telephone on Sprint's network or with such other reference points as may be reasonably available.

36. Based on my training and experience, I know that Sprint can collect cell-site data about the Target Telephone. I also know that wireless providers such as Sprint typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

37. Based on my training and experience, I know that wireless providers such as Sprint typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as Sprint typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the user or users of the Target Telephone and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

38. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

39. I further request that the Court direct Sprint to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on Sprint, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

40. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the

Court. These documents discuss an ongoing Federal criminal investigation that is not known the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

## CONCLUSION

41. I submit that this affidavit supports probable cause for a search warrant authorizing the search of the Target Telephone in Attachment A to seize the items described in Attachment B.

Respectfully submitted,

_Daniel Feaver_
DANIEL FEAVER
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before this
25th day of June, 2019

/s/Lois Bloom
HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

This warrant applies to records and information associated with the cellular telephone assigned call number 347-300-5824 (the "Target Telephone"), that is stored at premises controlled by Sprint, Inc. ("Sprint"), a wireless telephone service provider headquartered in Topeka, Kansas.

## ATTACHMENT B

## Particular Things to be Seized

I. **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Accounts listed in Attachment A for the time period August 29, 2018 through September 14, 2018, all dates being inclusive:

a. The following information about the customers or subscribers of the Account:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

2

      viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

      i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

      ii. information regarding the cell towers and sectors through which the communications were sent and received.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 922(g), and involving DARRELL WOODFORD during the period August 29, 2018 to September 14, 2018, all dates being inclusive.